# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

MICHAEL CHADWICK GEDDINGS, )
)
               Plaintiff, )
)
               v. )               1:15CV264
)
MR. ROBERTS, et al., )
)
               Defendants. )

## MEMORANDUM OPINION AND ORDER

LORETTA C. BIGGS, District Judge.

      Plaintiff, Michael Chadwick Geddings, initiated this action, *pro se,* pursuant to 42 U.S.C. § 1983 alleging violations of the United States Constitution. (ECF No. 2.) Before the Court is Defendant Michael McDougald's ("Defendant") Motion for Summary Judgment.[1] (ECF No. 47.) The matter is ripe for disposition. For the following reasons, the Court will **GRANT** Defendant's motion.

## I.    BACKGROUND

      This case arises out of a correctional officer's use of physical force against Plaintiff, a prisoner of the State of North Carolina in the custody of the North Carolina Department of

---

[1] Plaintiff's Complaint also named "Mr. Roberts." The action against Defendant Roberts was dismissed without prejudice (ECF No. 37) for Plaintiff's failure to comply with the Court's order to supply an updated address (ECF No. 36). Defendant McDougald is the only remaining Defendant.

Public Safety ("NCDPS").[2]  In March, 2015, Plaintiff filed a complaint against Defendant alleging that Defendant subjected him to excessive force while enforcing the "unconstitutional practice"[3] of punishing inmates by denying them dayroom (out of cell) recreation for up to (2) two days for even a minor infraction." (Compl., § V ¶¶ 2-3, ECF No. 2.)  Specifically, Plaintiff asserts the following account.

On December 17, 2014, Defendant entered C Pod, the unit in which Plaintiff was housed, alone at approximately 7:40 p.m. (*Id.* § V ¶ 3, ECF No. 2 at 4.)  Defendant approached Plaintiff in an unprofessional manner (*id.*) and disrespectfully demanded that Plaintiff lock down in his cell (Geddings Aff. ¶ 7).  When Plaintiff asked why, Defendant stated that another inmate had been in Plaintiff's cell, which was prohibited.  (Compl. § V ¶ 3.)  Plaintiff denied any wrongdoing and, instead of complying with what he perceived to be an unlawful order, Plaintiff "respectfully requested" to speak with the sergeant on duty before locking down.  (*Id.*)  Plaintiff then attempted to walk in the opposite direction of Defendant in order to sit at a table and wait for the sergeant.  (*Id.*)  Defendant blocked his path, bumping Plaintiff's chest with his own.  (*Id.* ¶ 5; Geddings Aff. ¶ 14.)  Plaintiff attempted twice more to walk in the

---

[2]  At the time of the alleged acts that serve as the basis of the Complaint, Plaintiff was incarcerated in Scotland Correctional Institution ("Scotland") located in Laurinburg, North Carolina while serving a fifty year, four month, and twenty day sentence for second-degree murder.  (W. Bullard Aff. ¶ 7, ECF No. 48-5.)

[3]  Plaintiff alleges Mr. Roberts authorized a policy imposing dayroom restriction for up to two days for even a minor infraction, and informed staff members under his authority that such punishment was a permissible practice.  (Compl. § V ¶ 2.)  Plaintiff contends that dayroom restriction is a punishment that can be imposed only when a detainee is found guilty of a disciplinary infraction.  (*Id.* ¶ 8.)  Plaintiff argues that the denial of privileges without procedural due process afforded inmates by the disciplinary procedure constituted a violation of right to due process.  (*Id.* ¶ 2, 8-9.)  Plaintiff therefore alleges that Defendant's order that Plaintiff lock down was not a lawful order.  (*Id.*)

opposite direction before he made it to a table where he sat down. (Compl. § V ¶ 5.) He made no movements which could be construed as threatening or aggressive. (*Id.*) Defendant came over to Plaintiff, and began pacing back and forth beside him, using profanity to repeat his request. (*Id.*; Geddings Aff. ¶ 18.) Defendant's conduct became threatening and angry. (Geddings Aff. ¶ 18.) Defendant demanded Plaintiff stand up, but did not indicate why. (Compl. § V ¶ 5.) Plaintiff remained seated, and again requested to see the sergeant on duty. (*Id.*; Geddings Aff. ¶ 19.) Then, without provocation or warning, Defendant sprayed pepper spray on Plaintiff's face "from point blank range." (Geddings Aff. ¶¶ 20-21.) Plaintiff "continue[d] to show no signs of aggression or threat" although he "may have pushed [Defendant's] arm away due to a natural reflex to protect [him]self." (Geddings Aff. ¶ 21.)

Plaintiff stated in his complaint that after hesitating, Defendant tackled Plaintiff onto the table. (Compl. § V ¶ 5.) Defendant hesitated again, then pulled Plaintiff off the stool, slamming Plaintiff's head and face into the floor. (*Id.*) Plaintiff almost lost consciousness. (*Id.*) In his affidavit, Plaintiff stated that Defendant

> attempt[ed] to tackle [him] immediately after spraying [him] with pepper spray. When [Defendant] [couldn't] move [Plaintiff], he then wrap[ped] his arm around [Plaintiff's] neck and pulled [Plaintiff] backward by way of [Plaintiff's] neck. When Defendant [couldn't] pull [Plaintiff] off the stool, he then pushe[d] [Plaintiff] sideways off the stool and slam[med] [Plaintiff's] face into the floor, almost knocking [Plaintiff] unconscious.

(Geddings Aff. ¶ 21.) Plaintiff further states that later, when Sergeant Locklear was attempting to cuff him,

> [a]n officer assisting Sergeant Locklear accidentally placed the right cuff on [his] left wrist and when she attempted to place the left cuff on [his] right wrist, the cuff on [his] left wrist turned and

> pinched [his] wrist, causing [him] to jump a little bit from the unexpected shock of pain. . . . Sergeant Locklear wasn't paying attention to the handcuffs and when [Plaintiff] jumped, she mistakenly thought [Plaintiff] was trying to resist. She placed [him] against the table. [Plaintiff] then explained the problem with the handcuffs. Sgt. Locklear look[ed] down and the officer correct[ed] the mistake made.

(Geddings Aff. ¶¶ 25-26.)

Plaintiff alleges that he was then taken to "segregation (lock up)" and placed in a holding cage, where he was examined by Nurse (FNU) Floyd, who noted a knot on his forehead and abrasions on his face and neck. (Compl. § V ¶ 6.) Nurse Floyd gave Plaintiff Tylenol for his head pain. (*Id.*) Sargent Simmons and Officer Hunt took photographs of Plaintiff's injuries (*id.* ¶ 7) which have not been made part of the record.

In the section of the complaint entitled "Exhaustion of Inmate Administrative Remedies," Plaintiff indicates that he filed several grievances and refers to a written letter which expressed the "continual rejections of [his] grievance based upon frivolous reasons and justifications." (*Id.* § III & Ex. I, ECF No. 2-9.)[4] Plaintiff now seeks a declaratory judgment that Defendant's acts violated Plaintiff's rights under the Constitution, as well as compensatory and punitive damages and injunctive relief. (*Id.* § VI ¶ 1, 4, 5.)

On October 23, 2015, Defendant moved for judgment on the pleadings arguing that Plaintiff failed to exhaust his administrative remedies. (ECF No. 20.) On July 11, 2016, this

---

[4] The attachments to Plaintiff's complaint show at least four grievances were submitted by Plaintiff surrounding the December 17, 2014, incident. (*See* Compl. Ex. A, ECF No. 2-1; *id.* Ex. C, ECF No. 2-3; *id.* Ex. H, ECF No. 2-8; *id.* Ex. J, ECF No. 2-10.)

Court denied Defendant's motion.  (ECF No. 35.)[5]  Defendant now moves for summary

judgment, again asserting that Plaintiff has failed to exhaust his administrative remedies.

(Def's Br. Supp. Mot. Summ. J., ECF No. 48 at 10-14.)  Defendant also argues that

> (2) the evidence demonstrates that on December 17, 2014 any
> force utilized by correctional staff was reasonably applied in a
> good faith effort to maintain and restore discipline because
> Plaintiff refused to comply with correctional orders to lock down;
> (3) Plaintiff cannot establish that on December 17, 2014
> Defendant acted maliciously or sadistically for the purpose of
> causing harm; (4) qualified immunity bars any claims against
> Defendant in his individual capacity; and (5) Eleventh
> Amendment and sovereign immunity bar any claims.

(Def's Mot. Summ. J., ECF No. 47 at 1.)

In support of his motion for summary judgment, Defendant has submitted numerous

affidavits and exhibits.  To address the incident itself, Defendant has submitted: his affidavit

and written statements (McDougald Aff. & Exs. A & B, ECF No. 48-10); the affidavits and

written statements of then-Sergeant on duty, Lieutenant Helena Locklear (H. Locklear Aff. &

Ex. C, ECF No. 48-7) and Correctional Officers Shaquanna Wall and Quatilla Wall (S. Wall

Aff. & Ex. A, ECF No. 48-8; Q. Wall Aff. & Ex. A, ECF No. 48-9); the incident report

(Bullard Aff. Ex. A, ECF No. 48-5) which contains written statements by Correctional

Officers Jessica Gonzalez, Yolanda Covington, Danielle Henry, and Benjamin Harrington,

and Nurse Amora Floyd, all of whom were present on December 17, 2014 (Gonzalez

---

[5]   The Court adopted the Magistrate Judge's recommendation that Defendant's motion be denied
because Plaintiff was prevented from availing himself of an administrative remedy through no
fault of his own.  (ECF No. 35; ECF No. 27 at 10 ("The court thus concludes that but for the
improper rejection of Plaintiff's grievance dated January 7, 2015, he would have exhausted
available administrative remedies as to the § 1983 claim he is now pursuing in federal court.").)

Statement, *id.* at 19; Covington Statement, *id.* at 20; Henry Statement, *id.* at 24; Harrington Statement, *id.* at 25; Floyd Statement, *id.* at 26); the affidavit of Nurse Supervisor Melissa Smith and selected medical records (Smith Aff. & Ex. A, ECF No. 48-11); the affidavit of Scotland's Assistant Superintendent for Custody and Operation III, William Bullard, who recommended an internal investigation based on the incident report (Bullard Aff. ¶¶ 5, 15, 31); the affidavit of Correctional Captain Marietta Barr (Barr Aff., ECF No. 48-6), her internal investigation report (*id.* Ex. A, ECF No. 48-6 at 10-31), North Carolina Department of Correction, Division of Prisons, Policies & Procedures § .1504, "Use of Force" (*id.* Ex. B, ECF No. 48-6 at 33-46); Scotland Standard Operating Procedures, Custody and Security § .6100, "Use of O.C. Pepper Spray" (*id.* Ex. C, ECF No. 48-6 at 48-55); and video footage of the incident (*id.* Ex. D, ECF No. 48-6 at 57).[6]

In his affidavit, Defendant offers his account of what occurred on December 17, 2014. According to Defendant he observed that Plaintiff had another inmate in his cell without authorization (McDougald Aff. ¶ 12.) He radioed the control booth operator to reopen the two inmates' cell doors so they could be locked down in their cells. (*Id.* ¶¶ 12-13.) Scotland had a staff shortage that evening, so he entered the Pod alone. (*Id.* ¶ 14.) Defendant ordered Plaintiff to lock down for unauthorized visitation. (*Id.* ¶¶ 15-16.) Plaintiff said, "Fuck that

---

[6] To address Plaintiff's failure to exhaust his administrative remedies, Defendant has submitted the affidavits of Jodi Harrison, Acting Executive Director of Inmate Grievance Resolution Board (Harrison Aff., ECF No. 48-2); North Carolina Department of Public Safety Administrative Remedy Procedure, (id. Ex. A, ECF No. 48-2 at 4-14); the affidavit of Donna Harris, Processing Assistant IV (Harris Aff., ECF No. 48-3); copies of selected grievance submitted by Plaintiff (*id.* Exs. A & B, ECF No. 48-3 at 9-17, 19); and the affidavit of Dean Locklear, Correctional Assistant Superintendent V at Scotland (D. Locklear Aff., ECF No. 48-4).

McDougald, I'm not locking down, and go get the Sergeant." (*Id.* ¶ 15.) Plaintiff then walked past Defendant, "brushing against [him] in an aggressive manner as [Defendant] attempted to block [Plaintiff's] path by standing in front of him." (*Id.* ¶ 17.) For refusing a direct order and for brushing up against him aggressively, Defendant ordered Plaintiff to stand up and submit to handcuffs. (*Id.* ¶ 20.) When Plaintiff refused to comply, Defendant took out his handcuffs and displayed them to Plaintiff while repeating his order. (*Id.* ¶ 21.) Plaintiff "continued to refuse and repeatedly stated, Fuck you, you can't make me move go get the Sergeant." (*Id.* ¶ 22.) Defendant "was worried because [he] was the only officer in the Blue Unit surrounded by other inmates. Other inmates were walking up which made [him] scared. Anything could have happened to [him]." (*Id.* ¶ 30.)

Defendant warned Plaintiff that he would spray him with OC Pepper Spray. Plaintiff still would not submit to handcuffs. (*Id.* ¶ 23.) Defendant then sprayed Plaintiff with one burst of pepper spray, and further attempted to grab Plaintiff's left hand while also trying to apply the mandibular angle pressure point technique. (*Id.* ¶¶ 24–25.) Plaintiff "smacked" away Defendant's first attempt to grab his right forearm. (*Id.* ¶ 26.) In so doing, Plaintiff pulled Defendant's arm inward toward Plaintiff's neck area. (*Id.* ¶ 27.) However, "at no time did [Defendant's] arm or hands go anywhere near Plaintiff's throat area, nor did [he] apply pressure to that region." (*Id.*) Defendant lost his balance, "due to the intensity of the pepper spray fumes and [Plaintiff's] resistance," and "fell to the floor still holding on to Plaintiff." (*Id.* ¶ 29.) At that time, Defendant heard the booth operator alert other staff members that an officer needed assistance in C Pod. (*Id.*) Defendant held Plaintiff in a secure position on the floor until other staff arrived and took over. Defendant had no further interactions with

Plaintiff.  (*Id.* ¶¶ 31, 33.)

Witness affidavits and written statements provide little detail to corroborate either account.  Yolanda Covington stated that when she arrived at C Pod, Plaintiff was sitting at a table, and he looked like he had been pepper sprayed.  (Covington Statement, Bullard Aff., Ex. A, ECF No. 48-5 at 20.)  Her written statement does not detail any further observations. (*Id.*)  Officer Quatilla Wall stated that she was working in the nearby medication window when she heard inmates being loud.  (Q. Wall Aff. ¶ 6.)  Jessica Gonzalez then notified Officer Quatilla Wall that Defendant needed assistance at C Pod.  (*Id.* ¶ 7.)  Officer Quatilla Wall further stated that she was first on the scene, that she called for assistance from the officer in the control booth, and that she later assisted others in handcuffing Plaintiff. (*Id.* ¶¶ 8–9.) Neither her affidavit nor her written statement detail any other observations.  (*Id.*)  Jessica Gonzalez, in the control booth, observed Defendant talking with Plaintiff and another inmate. (Gonzalez Statement, Bullard Aff., Ex. A, ECF No. 48-5 at 19.)  Officer Gonzalez stated that she "turned [her] head for a quick second to pop other cells . . .  when [she] turned back around [she] observed [Defendant] restraining one of the inmates he was speaking with and that's when [she] called over the radio for back up."  (*Id.*)

Sergeant Locklear was working canteen when she heard the control booth call her on the radio.  (H. Locklear Aff. ¶ 14.)  She was called a second time, and notified that she was needed in C Pod.  (*Id.* ¶ 15.)  When she arrived, Plaintiff was on the ground under the table and Defendant "was trying to control [Plaintiff] to maintain correctional order."  (*Id.* ¶ 16.) Sergeant Locklear stated that Plaintiff was visibly upset and combative and was threatening Defendant.  (*Id.* ¶¶ 17, 20.)  "Plaintiff was yelling that he was going to 'kick [Defendant's] ass.'"

(*Id.* ¶ 17.)   She said that as Sergeant on duty, she "took over for Defendant to diffuse [Plaintiff's] anger." (*Id.* ¶ 20.)   Sergeant Locklear and Officers Shaquanna Wall, Quatilla Wall and Danielle Henry helped Sergeant Locklear handcuff Plaintiff. (H. Locklear Aff. ¶¶ 22-24; S. Wall Aff. ¶¶ 10-11; Q. Wall Aff. ¶ 9; Henry Statement, Bullard Aff. Ex. A, ECF No. 48-5 at 24).   Sergeant Locklear stated that when they were attempting to handcuff Plaintiff, he "tried to resist and pull away.   He became combative.   [Plaintiff] was upset that he was pepper sprayed." (H. Locklear Aff. ¶ 22.)   Similarly, Officer Shaquanna Wall stated Plaintiff "would not submit to the handcuffs.   He became very aggressive." (S. Wall Aff. ¶ 10.)   Officer Shaquanna Wall also stated, as did others, that Plaintiff has a history of being "aggressive and combative toward staff and other inmates." (*Id.* ¶ 7; H. Locklear Aff. ¶ 11; Bullard Aff. ¶ 9; M. Barr Aff. ¶ 9.)   Sergeant Locklear and Officer Shaquanna Wall also stated that, in their experience, Defendant had been professional and had followed procedures and policies. (H. Locklear Aff. ¶ 8; S. Wall Aff. ¶ 8.)

Nurse Supervisor Melissa Smith reviewed the medical records, which showed that both Plaintiff's eyes and the right side of his face, his ear, and his forehead were red. (Smith Aff. ¶¶ 9-10 & Ex. A, ECF No. 48-11 at 6–7.)   Plaintiff also had a quarter-sized lump on his left-upper forehead. (*Id.*)   She further stated that Plaintiff reported minimal pain, his vitals were normal, that he was treated with cool water to rinse out his eyes, a cold compression for swelling, and non-aspirin medication for his headache. (*Id.*)   "No additional medical treatment was documented for the alleged December 17, 2014 incident." (Smith Aff. ¶ 15 & Ex. A, ECF No. 48-11 at 8-16.)

Assistant Superintendent for Custody and Operation III William Bullard, who reviewed the initial incident report, and Correctional Captain Barr, who conducted a subsequent internal investigation, both made statements as to various policies and procedures. (Bullard Aff. & Ex. A, ECF No. 48-5; Barr Aff. & Exs. B & C, ECF No. 48-6 at 33–55.) Superintendent Bullard stated that Plaintiff had been notified by a November 21, 2014 Memorandum that any Blue Unit inmate could be subjected to disciplinary action if he "loiter[s] in the dayroom and [does] not return to [his] cell in a timely manner" "when count is called or it is time to lock down any time during the day." (Bullard Aff. ¶ 19 & Ex. B, ECF No. 48-5 at 34.) Further, Superintendent Bullard stated that the mandibular angle pain pressure technique is an approved technique. (Bullard Aff. ¶ 28.) Bullard stated in his affidavit that

> pepper spray is permitted as the first level of response to control or deter violent, threatening or aggressive inmates. Hands-on physical force may be used to restrain or move a non-compliant inmate. The officer is authorized to use whatever degree of force that reasonably appears to be necessary to defend the officer or a third party from imminent assault.

(Bullard Aff. ¶ 14; *see also* Barr Aff. ¶¶ 15–17 & Exs. B & C, ECF No. 48-6 at 33–55.)

Per policy, an incident report was written and forwarded to Superintendent Bullard for approval. (Bullard Aff. ¶ 17.) The initial incident report, composed by Officer Brian M. McKnight, concluded,

> After reviewing the statements and video of the incident it appears the force used was excessive and inappropriate. There are additional discrepancies in the reporting parties statement and others collected that are not corroborated by the video. These discrepancies have been brought to the attention of administration and will be handled according to DPS policy and procedure.

(Bullard Aff. Ex. A, ECF No. 48-5 at 13.)  Superintendent Bullard also reviewed the video

footage.  (Bullard Aff. ¶ 17; Barr Aff. Ex. D, ECF No. 48-6 at 57.)  He noted that when

Plaintiff refused Defendant's direct orders, Defendant continued to talk to Plaintiff.  (Bullard

Aff. ¶¶ 25–26.)  Defendant

> then removed his pepper spray with his left hand, and passed it
> behind his back to his right hand.  [Plaintiff] was sprayed in the
> face with pepper spray for about [one] second. . . . [Defendant]
> then attempted to restrain [Plaintiff]. . . .  However, [Plaintiff]
> continued to resist and he grabbed [Defendant's] arm to stop
> him.  [Defendant] could not restrain [Plaintiff] and they fell to the
> floor under the table.

(*Id.* ¶¶ 27, 28.)  Superintendent Bullard recommended an internal investigation to gather

additional information and to determine whether Defendant used excessive or inappropriate

force on Plaintiff.  (*Id.* ¶ 31.)

Correctional Captain Barr was assigned to conduct the internal investigation.  (*Id.*)  She

concluded that

> Per Departmental policies and procedures, [Defendant] was
> permitted to use pepper spray because he first attempted to get
> [Plaintiff] to comply with his reasonable orders through verbal
> commands for several minutes. . . . [Defendant] attempted to gain
> control of [Plaintiff] by the right wrist, but he snatche[d] his arm
> away.  When [Plaintiff] snatched his arm away, [Defendant]
> attempted to apply the mandibular angle pain pressure technique.
> Because [Plaintiff] was resisting and being aggressive it appeared
> as though [Defendant] was grabbing his neck.  But [Defendant]
> never touched [Plaintiff's] throat or face area.  . . . [Defendant]
> attempted to apply handcuffs, but [Plaintiff] resisted and they fell
> to the floor.  [Defendant] continued to try to restrain [Plaintiff]
> on the floor, but he continued to resist and be combative. . . . Per
> policies and procedures, after he sprayed pepper spray,
> [Defendant] could use hands-on physical force on [Plaintiff] to
> restrain him.  [Plaintiff] would not comply with [Defendant's]
> orders.  Force was permitted by [Defendant] in order to gain

control and ensure that [Plaintiff] complied with correctional objectives. . . . Based on the facts and evidence, the investigation revealed that [Defendant] did use some inappropriate force on [Plaintiff] because he was resisting to being restrained and acting combative while drawing the attention of other inmates in the unit. Prior to utilizing any force, [Defendant] attempted repeatedly to get [Plaintiff] to comply with verbal orders. However, [Plaintiff] continued to be defiant and resist [Defendant's] orders. . . . [Defendant] acted reasonably based on the facts and circumstances. . . . There was no evidence to support that [Plaintiff] was subjected to an excessive use of force by [Defendant] . . . . Based on my experience, training and the investigatory findings, I did not then and do not now believe that [Plaintiff] was subjected to any excessive use of force on December 17, 2014 while housed at Scotland.

(Barr Aff. ¶¶ 36-38, 40, 47–50.)

Defendant provided a CD-ROM containing the recorded video surveillance camera footage from the incident. (Barr Aff., Ex. D; ECF No. 48-6 at 57.) The Court's viewing of the video footage[7] suggests the following: At the start of the footage, approximately twenty prisoners can be seen at leisure in the day room. (Video timestamp 7:35:11–32.) In the upper-right portion of the video, Plaintiff and another prisoner can be seen talking outside a cell. (*Id.*) Plaintiff walks toward and beyond the view of the video. (Video timestamp 7:35:32-53.) As Plaintiff walks back into view and toward the cell, the other prisoner enters the cell. (7:35:53-58.) Plaintiff arrives at the cell door and stands at the doorway while the other prisoner remains inside. (Video timestamp 7:36:05-15.) The other prisoner exits, and Plaintiff enters the cell while the other prisoner stands in the doorway. (Video timestamp 7:35:15-20.)

---

[7]    The video footage is approximately 7 minutes and 22 seconds. The video recording is without sound.

Defendant enters the frame and walks toward Plaintiff's cell. Plaintiff comes out and closes the door behind him. (Video timestamp 7:36:27-36.) Defendant walks up to Plaintiff, and appears to be speaking with him before moving around Plaintiff to reopen the cell door. (Video timestamp 7:36:36-46.) Defendant appears to gesture for Plaintiff to enter the cell. (Video timestamp 7:36:46-51.) Plaintiff attempts to walk away from Defendant, and Defendant blocks his path. (Video timestamp 7:36:36-55.) Plaintiff attempts to walk in the opposite direction. Defendant, again, circles around and blocks his path. (Video timestamp 7:36:55-7:37:01.) Plaintiff makes his way around Defendant and sits at a table and places his hands on the table. (Video timestamp 7:37:01-07.) Defendant stands beside him and both appear to speak. (Video timestamp 7:37:07-7:38:11.) Plaintiff raises his hand off the table, gesturing. (*Id*).

Defendant then reaches his arms up and back, appearing to stretch, then takes his pepper spray out of its holster on his left hip. (Video timestamp 7:38:11-29.) Defendant passes the pepper spray behind his back from his left to his right hand, raises it, and sprays Plaintiff. (Video timestamp 7:38:29-32.) Plaintiff hunches over. (Video timestamp 7:38:33.) Defendant immediately reaches for Plaintiff's right wrist. (*Id.*) Plaintiff throws off Defendant's grip. (Video timestamp 7:38:34-36.) Defendant then appears to reach between Plaintiff's arms and body toward Plaintiff's left wrist, then moves behind Plaintiff. It appears that Defendant's arm wraps around Plaintiff's throat as Plaintiff either leans, or is pulled, backward. (Video timestamp 7:38:36-37.) Plaintiff then leans to his right side toward Defendant then again hunches forward. (Video timestamp 7:38:37-40.) Defendant reaches over Plaintiff from behind, attempting to grab Plaintiff's left wrist and pull it behind him.

(Video timestamp 3:38:40-49.) As Defendant attempts to pull Plaintiff's arm back, Defendant's chest makes contact with Plaintiff's back, as Defendant falls, or pushes Plaintiff, to the ground. (Video timestamp 7:38:49-52.) Plaintiff appears to land on his head or face. (Video timestamp 7:38:52.) The camera's view of Plaintiff's movements is blocked by Defendant's body while Defendant moves, Plaintiff beneath him, toward and somewhat under an adjacent table at which point they become still. (Video timestamp 7:38:52-7:39:20.)

Another officer enters the screen. She stands near and crouches over the pair who remain mostly still, appearing to talk to Plaintiff. (Video timestamp 7:39:20-50.) A third officer enters the screen and appears to waive and radio for additional assistance as she walks toward Plaintiff and Defendant. (Video timestamp 7:39:50-7:40:08.) She then appears to tell or signal Defendant to release Plaintiff; Defendant gets up and walks around the table to again look at Plaintiff, then walks around the table again and stands beside Plaintiff as he gets up. (Video timestamp 7:40:08-42.) Defendant continues to speak with other prisoners and officers for about thirty seconds before exiting the screen. (Video timestamp 7:40:42-7:41:08.) Meanwhile, four additional officers arrive at the scene and assist in handcuffing Plaintiff who appears to resist. (Video timestamp 7:40:42-7:42:02.) As Plaintiff is escorted out (Video timestamp 7:42:02-21), guards pause to wipe his face with his shirt (Video timestamp 7:42:08-14).

In opposition to Defendant's motion for summary judgment, Plaintiff filed several declarations and affidavits; all but his own affidavit are the same as those filed by Defendant.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate when there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56; *Zahodnick v. Int'l Bus. Machs. Corp.*, 135 F.3d 911, 913 (4th Cir. 1997).  The party seeking summary judgment bears the initial burden of coming forward and demonstrating the absence of a genuine issue of material fact.  *Temkin v. Frederick Cty. Comm'rs*, 945 F.2d 716, 718 (4th Cir. 1991) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  Once the moving party has met its burden, the non-moving party must then affirmatively demonstrate that there is a genuine issue of material fact which requires trial.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a fact finder to return a verdict for that party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Sylvia Dev. Corp. v. Calvert County*, 48 F.3d 810, 817 (4th Cir. 1995).  Thus, the moving party can bear his burden either by presenting affirmative evidence or by demonstrating that the non-moving party's evidence is insufficient to establish his claim.  *Celotex*, 477 U.S. at 331 (Brennan, J., dissenting).  When making the summary judgment determination, the Court must view the evidence, and all justifiable inferences from the evidence, in the light most favorable to the non-moving party.  *Zahodnick*, 135 F.3d at 913.  However, the party opposing summary judgment may not rest on mere allegations or denials, and the court need not consider "unsupported assertions" or "self-serving opinions without objective corroboration."  *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996); *Anderson,* 477 U.S. at 248-49.  Here, Plaintiff is a *pro se* litigant; thus, his pleadings are to be liberally construed.  *Graham v. Geneva Enters., Inc.*, 55 F. App'x 135, 136 (4th Cir. 2003).

Defendant here seeks to rely, in part, upon video evidence in support of his motion for summary judgment. "[W]hen a video 'quite clearly contradicts the version of the story told by [the plaintiff] . . . so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.'" *Witt v. W. Va. State Police, Troop 2*, 633 F.3d 272, 276 (4th Cir. 2011) (quoting *Scott v. Harris,* 550 U.S. 372, 378, 380 (2007) (alteration in original)); *see also Bostic v. Rodriguez,* 667 F. Supp. 2d 591, 605 (E.D.N.C. 2009) ("[T]o the extent plaintiffs' recollection and the video are inconsistent, the video speak[s] for itself, and the court considers the facts as displayed in the video." (second alteration in original) (internal quotation marks omitted)). Nevertheless, "to the extent that the videos are unclear and ambiguous, the Court must adopt [P]laintiff's version of events for purposes of [Defendants' motion]." *Glascoe v. Sowers*, No. ELH-11-2228, 2013 WL 5330503, at *5 (D. Md. Sept. 20, 2013), *aff'd*, 570 F. App'x 344 (4th Cir. 2014). Moreover, this Court should not "reject a plaintiff's account on summary judgment whenever documentary evidence, such as a video, offers [only] *some* support for a governmental officer's version of events." *Witt*, 633 F.3d at 276 (emphasis in original).

## III.   DISCUSSION

Defendant moves for summary judgment on the grounds that: (a) Plaintiff has failed to exhaust his administrative remedies; (b) the evidence demonstrates that on December 17, 2014 any force used by the correctional staff was reasonably applied in a good faith effort to maintain and restore discipline; (c) Plaintiff cannot establish that Defendant acted maliciously or sadistically for the purpose of causing harm; (d) qualified immunity bars any claim against Defendant in his individual capacity; and (e) Eleventh Amendment and sovereign immunities

bar any claim. The Court will address each of these basis for dismissal. (ECF No. 47).

**A. <u>Failure to Exhaust Administrative Remedies</u>**

Defendant argues that Plaintiff's complaint should be dismissed for failure to exhaust his administrative remedies prior to filing this action, as he did in his motion for judgment on the pleadings (ECF No. 20). (Def.'s Br. Supp. Mot. Summ. J., ECF No. 48 at 10-14.) This Court has already considered and ruled on this issue. (*See* Docket Entries 27, 35.) The Court has reviewed the evidence and again finds that Plaintiff did not exhaust his administrative remedies. Nevertheless, as discussed in detail in the Magistrate Judge's memorandum opinion and recommendation (ECF No. 27) and adopted by this Court (ECF No. 35), there is a genuine issue as to whether Plaintiff was prevented from availing himself of an administrative remedy through no fault of his own. *See Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008). A dispute as to Plaintiff's failure to exhaust his administrative remedies does not, however, preclude summary judgment whereas here, the Court concludes that viewing the evidence, and all inferences from the evidence, in the light most favorable Plaintiff, Plaintiff is unable to demonstrate that there is any genuine issue of material fact that requires trial on any claim.

**B. <u>Excessive Force</u>**

Plaintiff claims that Defendant violated the prohibition against cruel and unusual punishment guaranteed by the Eighth Amendment to the Constitution of the United States. U.S. CONST. amend. VIII. The Eighth Amendment, among other things, protects prison inmates from inhumane treatment during the course of their imprisonment. *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996). Eighth Amendment excessive force claims require both a subjective and an objective component to be satisfied. *Id.* The precise requirements

of the objective and subjective components "'var[y] according to the nature of the alleged constitutional violation.'" *Id.* (quoting *Hudson v. McMillian*, 503 U.S. 1, 5 (1992)). The objective component inquires whether the deprivation suffered or injury inflicted on the inmate was sufficiently serious, while the subjective component involves an inquiry as to whether the prison official acted with a sufficiently culpable state of mind. *Id.*

In meeting the objective component of the Eighth Amendment excessive force analysis, a plaintiff need only demonstrate that the injury inflicted was not *de minimis*. *Hudson*, 503 U.S. at 9–10; *Williams*, 77 F.3d at 761. "A prisoner, like [Plaintiff], asserting malicious and sadistic use of force need not show that such force caused an 'extreme deprivation' or 'serious' or 'significant' pain or injury to establish a cause of action . . . . All that is necessary is proof of more than *de minimis* pain or injury." *Williams*, 77 F.3d at 761 (citing Hudson, 503 U.S. at 8–9.) "[A]n injury of any significance, however lasting or prominent physically, satisfies the objective component." *Eaker v. Overturf*, No. 07 CV 608, 2010 WL 3023312, at *5 (M.D.N.C. July 28, 2010).

In this case, Plaintiff asserts that he suffered head pain from a knot on his forehead.[8] The medical evidence corroborates reddened eyes and face, and a quarter-sized lump (contusion) on Plaintiff's upper-left forehead. (Smith Aff. Ex A, ECF No. 48-11 at 7.) While Plaintiff does not assert any lasting or permanent injury as a result, it is nonetheless clear that the force used, according to his version of the facts, caused more than *de minimis* injury. While

---

[8]   In his complaint, Plaintiff stated that that Nurse Floyd noted abrasions on Plaintiff's face and neck. (§ V ¶ 6.) The medical notes show that Plaintiff's face and eyes were reddened, but note no abrasions. (Smith Aff. Ex. A, ECF No. 48-11 at 1.) The records indicated that the redness would subside within twenty-four hours. (Smith Aff. Ex. A, ECF No. 6-8.)

Plaintiff's claim thus satisfies the objective component of the Eight Amendment excessive force analysis, the Court finds that for the reasons set forth below, Plaintiff's claim fails to satisfy the subjective component of the analysis.

Prison officials are given a certain amount of discretion in decisions to use force. *Williams*, 77 F.3d at 765. This is because they are frequently called upon to maintain order, quell disturbances, and act "in haste, under pressure . . . frequently without the luxury of a second chance." *Whitley v. Albers*, 475 U.S. 312, 320 (1986). Because of the need for such latitude, the subjective component a plaintiff must satisfy in the excessive force context is a relatively high standard. An inmate can prove the subjective component only by showing that officials "inflicted unnecessary and wanton pain and suffering." *Miller v. Leathers*, 913 F.2d 1085, 1087 (4th Cir. 1990) (quoting *Whitley*, 475 U.S. at 320). To determine whether the force applied was unnecessary and wanton, a court should consider "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Whitley*, 475 U.S. at 320–21(internal quotation marks omitted); *see Williams*, 77 F.3d at 761. To do so, courts should balance: (1) "the need for application of force"; (2) "the relationship between that need and the amount of force used"; (3) "the threat 'reasonably perceived by the responsible officials'"; and (4) "any efforts made to temper the severity of a forceful response." *Hudson*, 503 U.S. at 7 (quoting *Whitley*, 475 U.S. at 312). Courts may also consider the nature and severity of the injury inflicted. *Whitley*, 475 U.S. at 321; *Miller*, 913 F.2d at 1087.

The conflicting affidavits present two somewhat different versions of the events that took place, and the video evidence fails to provide further clarity on several issues. First, the parties dispute who bumped or brushed the other[9] and whether Plaintiff was otherwise aggressive.[10] (Geddings Aff. ¶ 14; McDougald Aff. ¶ 17.) Second, the parties dispute whether Defendant ordered Plaintiff to submit to handcuffs, and consequently, whether Plaintiff refused to submit to handcuffs. (McDougald Aff. ¶ 20; Geddings Aff. ¶ 19.)[11] Third, the parties dispute whether Defendant gave warning that he was going to use pepper spray. (McDougald Aff. ¶ 23; Geddings Aff. ¶¶ 20-21.)[12] Fourth, the parties dispute whether

---

[9] Plaintiff alleges that Defendant bumped Plaintiff with his chest while refusing to call the Sergeant on Duty, and that Plaintiff was at all times respectful, non-aggressive, and non-threatening. (Geddings Aff. ¶ 17, 14, 21.) In contrast, Defendant alleges Plaintiff "brush[ed] up against him in an aggressive manner" as he attempted to block Plaintiff's path and was otherwise aggressive, combative, and defiant. (McDougald Aff. ¶ 17.) The video does not resolve this dispute, and the evidence Defendant submitted is divided on this question. *Compare* Bullard Aff. Ex. A, ECF No. 48-5 at 12 "[Defendant] moves to block [Plaintiff's] bumping [Plaintiff] with his chest") *with id.* ¶ 23 ("[Defendant] moved to block [Plaintiff's path. [Plaintiff] bumped [Defendant] in the chest.

[10] The video shows that Plaintiff raised his arm repeatedly while sitting at the table. (Barr Aff ¶ 34; Video Timestamp 7:38:13.) Plaintiff appeared to be gesturing. (*Id.*) Neither Defendant nor Captain Barr alleges that this constituted aggressive conduct; rather Defendant alleges that he ordered Plaintiff to submit to handcuffs "for refusing a direct order and for brushing up against [him] in an aggressive manner, and pepper sprayed him "because [Plaintiff] refused to comply with [Defendant's] order to submit to handcuffs. (McDougald Aff. ¶¶ 20, 24) He also alleges that Plaintiff was "combative and defiant." (*Id.* ¶ 16.) The evidence does show that Plaintiff was at least verbally aggressive after (and because) Defendant pepper sprayed him (H. Locklear Aff. ¶ 17), but there is no evidence the Plaintiff was aggressive prior to Defendant's use of force.

[11] Defendant alleges that he "took out [his] handcuffs and displayed the handcuffs to [Plaintiff] while telling him to get up and submit to handcuffs." (McDougald Aff. ¶ 21.) In contrast, Plaintiff stated that Defendant ordered him to stand up from the table, but that "it was not clear as to why he wanted [Plaintiff] to stand up." (Geddings Aff. ¶ 19.) The video does not fully resolve this dispute, because although Defendant does not appear to display his handcuffs to Plaintiff. Without sound, it is unclear whether Defendant verbally ordered Plaintiff to submit to handcuffs.

[12] The video does show that after stretching, Defendant "remove[d] his pepper spray with his left hand and passe[d] it behind his back to his right hand then quickly reache[d] out and spray[ed]

20

Defendant grabbed or choked Plaintiff by his neck. (Geddings Aff. ¶ 21; McDougald Aff. ¶ 27.)[13] Finally, the parties dispute how Plaintiff ended up on the floor. (Geddings Aff. ¶ 21; McDougald Aff. ¶ 29 & Ex. A, ECF No. 48-10 at 8, 12.)[14] The record thus fails to establish as a matter of law that Defendant did not bump Plaintiff's chest, pepper spray him without warning, intentionally choke his neck or slam his face into the floor. It also fails to establish that Plaintiff was aggressive prior to Defendant's use of force or that Plaintiff refused to submit to handcuffs. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Med. Shoppe Int'l, Inc. v. Siddiqui*, 549 F. App'x 131, 134 (4th Cir. 2013) (quoting *Anderson*, 477 U.S. at 255 (1986)).

These disputes do not, however, preclude summary judgment. Construing the

---

[Plaintiff] in the face" (Bullard Aff., Ex. A, ECF No. 48-5 at 12.) That Defendant appeared to attempt to hide the pepper spray as he prepared to use it tends to lend support Plaintiff's claim that Defendant gave no warning.

[13] Plaintiff alleges that Defendant "wrap[ped] his arm around [Plaintiff's] neck and pull[ed] [him] backward by way of [his] neck." (Geddings Aff. ¶ 21.) Defendant denies that he "grabbed Plaintiff's throat." (McDougald Aff. ¶ 27.) Defendant alleges that when he "tried to gain control of [Plaintiff's] right arm which he had used to grab the table when he snatched away, pulling [Defendant's] arm inwards towards his neck area possibly making it appear that [Defendant] was choking [Plaintiff]." (*Id.*) While the video provides *some* support for Defendant's account, it is not definitive. (Video Timestamp 7:38:36-37.)

[14] Plaintiff alleges that when Defendant couldn't pull him off the stool by his neck, Defendant "then pushe[d] [Plaintiff] sideways off the stool and slam[ed] [his] face into the floor . . . ." (Geddings Aff. ¶ 21.) Although in his affidavit Defendant attributed this to losing his balance and falling while still holding Defendant (McDougald Aff. ¶ 29), neither his December 17, 2014 nor March 24, 2015 statement recount any such loss of balance (*id.* Ex. A, ECF No. 48-10 at 8, 12). Rather, on March 24, 2015, Defendant stated that Plaintiff "was resisting and began to grab at the table which lead [sic] me to have to take him down to the floor." (*Id.* at 12.)

evidence in the light most favorable to Plaintiff, a reasonable fact finder could determine that when Defendant ordered Plaintiff to lock down: (1) Defendant bumped Plaintiff's chest; (2) Plaintiff was non-compliant, but also non-aggressive prior to Defendant's use of force; (3) Defendant ordered Plaintiff to stand up, and Plaintiff refused; (4) without warning, Defendant administered pepper spray; (5) Defendant then attempted to restrain Plaintiff, in part, by wrapping his arm around Plaintiff's neck from behind, choking him; and (6) Defendant intentionally pushed Plaintiff face first to the ground.

Construing the facts in this light, the Court nevertheless finds that no reasonable jury could find that Defendant's use of force was applied maliciously and sadistically for the very purpose of causing harm. As further explained below, the factors articulated in *Whitley* weigh heavily in Defendant's favor: there was a need for force, and in light of the perceived threat and Defendant's efforts to temper the force used, the forced used was proportional to the need for it. Taken as a whole, analysis of the Whitley factors shows that Defendant applied force in a good faith effort to maintain or restore discipline. *See e.g.*, *Kitchen v. Ickes*, 116 F. Supp. 3d 613, 628–29 (D. Md. 2015) (finding that the officer's "use of pepper spray [on prisoner who failed to comply with orders to stop fighting] was not excessive in relation to the need to restore order and protect the inmates"), *aff'd*, 644 F. App'x 243 (4th Cir. 2016); *Hicks v. Simpkins*, 2006 WL 2303179 (W.D. Va. Aug. 9, 2006) (finding no excessive force where inmate was sprayed with pepper spray after twice disobeying a direct order to return to his cell).

As to the first *Whitley* factor, the need for force, there is no dispute that Plaintiff refused to comply with Defendant's orders to lockdown and stand up. The Fourth Circuit has

recognized that "[p]hysical contact and force are inherent in maintaining order and providing safety." *United States v. Gore*, 592 F.3d 489, 493 (4th Cir. 2010). Case law and the relevant policies and procedures support that "[a] prisoner's failure to comply with an officer's order permits the officer to use some measure of force to gain the prisoner's compliance or to respond to a threat that arises because of the prisoner's failure to comply." (Barr Aff. Exs. B & C, ECF No. 48-6 at 36, 50 ("Hands-on Physical Force . . . may be used: (1) To restrain or move a non-aggressive, non-compliant inmate." "An inmate is subject to being sprayed when . . . the inmate refuses to comply with a lawful command related to the maintenance of the good order and security of the facility or refuses to comply with lawful command to do any act or refrain from doing any act that is necessary for legitimate safety concerns for the facility."); *Mallory v. Hetzel*, No. 2:12-CV-1011-SHA, 2016 WL 5030469, at *11 (M.D. Ala. Aug. 26, 2016) (citing *Danley v. Allen*, 540 F.3d 1298, 1308 (11th Cir. 2008) ("[Plaintiff] created a disturbance by failing to obey orders, and the jailers' initial use of pepper spray was a reasonable response to that threat."))). *See also Roberts v. McCabe*, No. 3:15CV420, 2017 WL 990601, at *10 (E.D. Va. Mar. 14, 2017) (prisoner's insubordination and failure to follow a direct order created a moderate security threat). Plaintiff's undisputed refusal to comply with Defendant's order to lock down or get up from the table therefore justified some need for force to restore order.

The surrounding circumstances are also highly relevant to the Court's analysis of the need for force, as well as to its analysis of the third factor—the extent of any reasonably perceived threat. *Harper v. Blagg*, No. 2:13-cv-19796, 2015 WL 6509131, at *7 (S.D.W. Va. Oct. 28, 2015) ("Undoubtedly, the surrounding circumstances are vitally important when

considering this first factor, as with all of the *Whitley* factors." (citing *Mann v. Scott*, No. 0:14–3474–RMG, 2015 WL 5165198, at *5 (D.S.C. Sept. 1, 2015) ("Use of chemical munitions on prisoners may or may not constitute excessive force, and the *Whitley* factors depend on the circumstances surrounding the application of the chemical munitions and any treatment and decontamination following." (citations omitted)))). In applying the third *Whitley* factor, the Court "must consider the extent of any threat posed by [Plaintiff] to the staff or other inmates, as reasonably perceived by [Defendant] based on the facts known to him at the time." *Tedder v. Johnson*, 527 F. App'x 269, 273 (4th Cir. 2013).

Here, Defendant states that he was "worried because he was the only officer in Blue Unit surrounded by other inmates" who "were walking up which made him scared." (McDougald Aff. ¶ 30.) It is undisputed that Scotland was short staffed on December 17, 2014. (*Id.* ¶ 14; *see* Q. Wall Aff. ¶ 6 (working medicine line when called to respond); Locklear Aff. ¶ 14 (working canteen when called to respond).) It is also undisputed that Defendant entered the Pod alone, where approximately twenty prisoners were moving freely about. (Video timestamp 7:36:27-36.) Security concerns were therefore heightened. *See Clark v. Koon*, No. 05-4080-CV-C-NKL, 2006 WL 2788406, at *4 (W.D. Mo. Sept. 25, 2006) (finding no genuine issue of material fact as to whether officer used pepper spray in a good-faith effort to maintain security and discipline where prisoner approached officer in a restricted area at a time when security concerns were heightened and failed to comply with officer's order to return to his cell). In addition, Captain Barr stated (and the video confirms) that Plaintiff's defiance was drawing the attention of other prisoners. (Barr Aff. ¶ 47; Video timestamp 7:37:07-7:38:11; *see Soto v. Dickey*, 744 F.2d 1260, 1267 (7th Cir. 1984) ("When an inmate refuse[s] to obey a

proper order, he is attempting to assert his authority over a portion of the institution and its officials. Such refusal and denial of authority places the staff and other inmates in danger."). Plaintiff's non-compliance appears, under the circumstances, to have posed a significant threat in light of the staff shortages and the fact that Defendant was momentary alone,[15] whether or not Plaintiff was actually aggressive prior to Defendant's use of force.

The fourth *Whitley* factor (any effort to temper the force used) also weighs in Defendant's favor. The video footage confirms that Defendant attempted verbal commands for over two minutes before resorting to force. (Video timestamp 7:36:27–7:38:32.) Defendant was authorized to use pepper spray on a non-compliant prisoner. (Barr Aff. Ex. C, ECF No. 48-6 at 51.) Defendant thereafter attempted to use the approved mandibular angle pressure point technique before using greater force. (McDougald Aff. ¶ 25; Barr Aff. ¶ 37.) Plaintiff continued to resist Defendant's grip (Video timestamp 7:38:33-3:38:49), at which point Defendant resorted to "tak[ing] [Plaintiff] down to the floor" to restrain him (McDougald Aff. Ex. B, ECF No. 48-10 at 12). When Sergeant Locklear arrived some thirty seconds later (Video timestamp 7:39:20), Plaintiff was verbally aggressive (H. Locklear Aff. ¶ 17). Plaintiff also continued to resist even when other officers took over, necessitating the

---

[15] Defendant and others note Plaintiff's history of being aggressive and combative towards staff and inmates as well as his numerous disciplinary infractions prior to December, 2014. (McDougald Aff. ¶ 7; H. Locklear Aff. ¶ 11; Bullard Aff. ¶ 9; Barr Aff. ¶ 9.) A prisoner's undisputed history is undoubtedly relevant to the perceived threat. *See Harper v. McCloud*, No. 2:12-cv-00656, 2014 WL 1159129, at *22–*23 (S.D.W. Va. Mar. 21, 2014) (finding prisoner's history relevant where he was in the punitive segregation wing at the time of the incident involving alleged excessive force), *aff'd*, 575 F. App'x 206 (4th Cir. 2014). Here, however, Defendant does not allege that he had any knowledge of Plaintiff's prior infractions or other "good reason to approach Plaintiff with particular care" when he confronted Plaintiff. (McDougald Aff. ¶¶ 10-11.) Because it is unclear where Plaintiff's history was known to Defendant "at the time," it did not contribute to the threat Defendant reasonably perceived.

continued use of force by other officers to handcuff Plaintiff. (Video timestamp 7:40:42-7:42:02; H. Locklear Aff. ¶¶ 22-23; S. Wall Aff. ¶ 10.)

In light of the need for force, the threat Defendant perceived, and Defendant's efforts to temper the force used, it is clear that the second *Whitley* factor—the relationship between the need for the use of force and the amount of force used—also weighs in Defendant's favor. Plaintiff alleges that Defendant's conduct did not comport with the relevant policies and procedures (Pl.'s Br. Opp. Mot. Summ. Judgment, ECF No. 55 at 10-13), policy directives "do not ... establish constitutional minima" and a correctional officer's "variance" from policy directives "does not *per se* establish a violation of [an inmate's] constitutional rights." *Harper v. McCloud*, No. 2:12-cv-00656, 2014 WL 1159129, at *21 (S.D.W. Va. Mar. 21, 2014), *aff'd*, 575 F. App'x 206 (4th Cir. 2014). Correctional policy directives, however, merely "establish goals recommended by the organization in question," *Bell v. Wolfish*, 441 U.S. 50, 543 n.27 (1979), and constitute "'a resource that offers analogous guidance for a correctional officer's measured response' to *certain* situations," *Harper*, 2015 WL 6509131, at *8 (quoting *Harper*, 2014 WL 1159129, at *22 (emphasis added)).

The Court's review of the relevant policies and procedures reveals that Defendant was authorized to use force to restrain or control Plaintiff. (Barr Aff. Exs. B & C, ECF No. 48-6 at 36, 50 ("Hands-on Physical Force . . . may be used: (1) To restrain or move a non-aggressive, non-compliant inmate." "An inmate is subject to being sprayed when . . . the inmate refuses to comply with a lawful command related to the maintenance of the good order and security of the facility or refuses to comply with lawful command to do any act or refrain from doing any act that is necessary for legitimate safety concerns for the facility.").) An officer's duty to

issue a warning or await additional staff prior to using pepper spray or, having administered pepper spray, to wait some period of time before attempting to restrain a prisoner, depends entirely on the circumstances.[16]

Here, under the circumstances as described above, Defendant's use of pepper spray, even without warning, was proportional to the need. It was also reasonable, given the staff shortage, for Defendant to do so without waiting for other officers. That Defendant became verbally aggressive after being sprayed (H. Locklear Aff. ¶ 17) also suggests that the circumstances did not permit Defendant to wait to attempt to restrain Plaintiff after administering the pepper spray. The second *Whitley* factor thus weighs in favor of Defendant.

Finally, the record shows that the extent of Plaintiff's injuries were relatively minor as they pertain to the analysis of Defendant's subjective intent. Plaintiff's minor contusion was treated with non-aspirin medication and the redness on his face was expected to subside within twenty-four hours. (Geddings Aff. ¶ 27; Smith Aff. Ex. A, ECF No. 48-11 at 6-8.) Although, as discussed above, Plaintiff's injuries are sufficient to satisfy the objective component of the Eighth Amendment analysis, they are not, in themselves, sufficient to weigh in Plaintiff's favor in the subjective determination. There is thus no factor in the Court's analysis of the subjective

---

[16] The Department of Public Safety, Division of Adult Corrections and Juvenile Justice, Scotland Correctional Institution Standard Operating Procedures, ch. 4 § .6100 provides guidelines for the use of O.C. Pepper Spray. (Barr Aff. Ex. C, ECF No. 48-6 at 48-55.) "A warning is required before using O.C. Pepper Spray, if the warning may be given without risk of injury to persons or property. No warning is required if an imminent threat exists to the safety of any person or in self defense." (*Id.* at 50.) "Staff addressing a non-compliant/non-aggressive will radio and await the arrival of additional Staff before using O.C. Pepper Spray to gain compliance from the inmate." (*Id.*) "Normally, in situations where the inmate is non-aggressive, the Correctional Officer will consult with the Sergeant or other supervisor before using O.C. Pepper Spray to gain compliance of an inmate." (*Id.* at 51.) "If Circumstances allow, do not attempt to forcibly handcuff a subject immediately after exposure to O.C. Pepper Spray." (*Id.* at 53.)

component that weighs in Plaintiff's favor. Plaintiff has failed to satisfy the subjective

component of the of Eighth Amendment excessive force analysis. Thus, the Court concludes

that no reasonable jury could find that Defendant applied force maliciously and sadistically for

the very purpose of causing harm, and Defendant, therefore, is entitled to judgment as a matter

of law on Plaintiff's claim of excessive force.

## C. **Qualified Immunity**

Defendant next asserts that he is entitled to qualified immunity. (Def.'s Br., ECF No.

48 at 18-19.) Under the doctrine of qualified immunity, "government officials performing

discretionary functions generally are shielded from liability for civil damages insofar as their

conduct does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also*

*Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 306 (4th Cir. 2006) ("Qualified immunity

shields government officials performing discretionary functions from personal-capacity

liability for civil damages under § 1983 . . . ."). The traditional two-step qualified immunity

inquiry requires a court to determine: "(1) whether the official violated a constitutional right;

and if so (2) whether the right was clearly established at the time of its violation." *Rock for Life-*

*UMBC v. Hrabowski*, 411 F. App'x 541, 547 (4th Cir. 2010) (internal quotation marks omitted).

In evaluating qualified immunity, a court initially may determine whether the plaintiff has

alleged or shown a violation of a constitutional right at all. *See Pearson v. Callahan*, 555 U.S. 223

(2009).[17] Further, "[b]ecause qualified immunity is designed to shield officers not only from

---

[17] In *Pearson*, the Supreme Court overruled the mandatory two-step sequence adopted in *Saucier v.
Katz*, 533 U.S. 194 (2001), in analyzing qualified immunity. Thus, after *Pearson*, courts are free "to

liability but from the burdens of litigation, its establishment at the pleading or summary judgment stage has been specifically encouraged." *Pritchett v. Alford*, 973 F.2d 307, 313 (4th Cir. 1992). In the instant case, having found that Plaintiff has not supported his claim for a constitutional violation, Defendant should be entitled to qualified immunity. *See Jackson v. Holley*, 666 F. App'x 242, 244–45 (4th Cir. 2016) ("[T]he conduct about which [plaintiff] complains does not amount to an Eighth Amendment violation. Thus [defendant] was entitled to qualified immunity and her motion to dismiss should have been granted by the district court." (citing *Wilkins*, 559 U.S. at 38–39; *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011))).

## D. **Eleventh Amendment**

Defendant argues further that Plaintiff failed to allege in his complaint that he is suing Defendant in his official capacity, that any claim against him in his official capacity is barred by sovereign immunity pursuant to the Eleventh Amendment. (Def.'s Br., ECF No. 48 at 19.) Defendant contends that he is therefore entitled to summary judgment on Plaintiff's official capacity claims. The Eleventh Amendment prohibits actions in federal court by individuals against a state unless the state has consented to suit or unless Congress has lawfully abrogated the state's Eleventh Amendment immunity. *Ballenger v. Owens*, 352 F.3d 842, 844–45 (4th Cir. 2003). The doctrine of sovereign immunity under the Eleventh Amendment applies not only to actions in which the State is a named defendant, but also to actions against its departments, institutions, and agencies. *DeMurry v. N.C. Dep't of Corr.*, 673 S.E.2d 374, 380–81 (N.C. Ct.

---

exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances . . . ." *Pearson*, 555 U.S. at 236.

App. 2009). Additionally, in North Carolina, "[a]ctions against officers of the State in their official capacities are actions against the State for the purposes of applying the doctrine of [sovereign] immunity." *Green v. Kearney*, 690 S.E.2d 755, 762 (N.C. Ct. App. 2010) (alterations in original) (internal quotation marks omitted); *see also Mullis v. Sechrest*, 495 S.E.2d 721, 725 (N.C. 1998) ("[O]fficial-capacity suits are merely another way of pleading an action against the governmental entity."). Further, compensatory damages are unavailable in official capacity suits under § 1983. *Biggs v. Meadows*, 66 F.3d 56, 61 (4th Cir. 1995). Here, a suit against Defendant in his official capacity is a suit against NCDPS and North Carolina. Neither has consented nor waived immunity; therefore, any monetary claims against Defendant in his official capacity will be dismissed.

### E. Punitive Damages

Defendant asserts that he is entitled to summary judgment on Plaintiff's claim for punitive damages. (Def.'s Br., ECF No. 48 at 19–20.) The Court notes that Plaintiff "is not entitled to monetary damages under § 1983 against Defendant[] . . . in [his] official capacit[y]." *Moneyhan v. Keller*, 563 F. App'x 256, 258 (4th Cir. 2014). Damages are available against a defendant in an individual capacity only for conduct that "involves 'reckless or callous indifference to the federally protected rights of others,' as well as for conduct motivated by evil intent." *Cooper v. Dyke*, 814 F.2d 941, 948 (4th Cir. 1987) (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)). Having concluded that no reasonable jury could find that Defendant's conduct was motivated by evil intent, Plaintiff is not entitled to punitive damages.

### F. Injunctive Relief

Plaintiff also seeks a "preliminary and permanent injunction ordering Defendant to

cease his acts of attempting to punish inmates by denying them their privileges without procedural due process afforded them by the disciplinary procedure, as well as using methods of intimidation, provocation, and physical violence in order to compel inmates, who are being peaceful, to comply with his demands." (Id. § VI ¶¶ 3-5.) For the reasons set forth below, this claim is without merit.

The substantive standard for granting either a temporary restraining order or a preliminary injunction is the same. *See e.g.*, *U.S. Dep't of Labor v. Wolf Run Mining Co.*, 452 F.3d 275, 281 n.1 (4th Cir. 2006). Temporary restraining orders are governed by Rule 65 of the Federal Rules of Civil Procedure, which provides that a temporary restraining order shall not issue in the absence of "specific facts [which] clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party may be heard in opposition." Fed. R. Civ. P. 65(b)(1). The United States Supreme Court has stated that the movant must establish the following to obtain a temporary restraining order or a preliminary injunction: (1) "that he is likely to succeed on the merits"; (2) "that he is likely to suffer irreparable harm in the absence of preliminary relief"; (3) "that the balance of equities tips in his favor"; and (4) "that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

Here, Plaintiff has not demonstrated that he is likely either to succeed on the merits or to suffer irreparable harm in the absence of preliminary relief. First, Plaintiff has not presented any evidence that a two-day deprivation of day-room privileges without procedural protections was either a sanctioned practice or that Defendant enforced such a practice at any time against Plaintiff or anyone else. Second, "the law is well settled that confinement in administrative

segregation does not exceed the sentence imposed in such an extreme way as to give rise to the protection of the Due Process Clause by its own force." *Burris v. Hamrick*, No. 1:09CV70-02-MU, 2009 WL 427384, at *1 (W.D.N.C. Feb. 20, 2009) (citing *Beverati v. Smith*, 120 F.3d 500, 502 (4th Cir. 1997). Plaintiff has not shown that this type of discipline would "impose[] atypical and significant hardship on [Plaintiff] in relation to the ordinary incidents of prison life" to constitute a liberty interest and thereby implicate Due Process. *Beverati*, 120 F.3d at 502 (internal quotation marks omitted). In addition, because Plaintiff was unable to meet the standard for the subjective component of the excessive force analysis under the Eight Amendment, the balance of equities does not tip in his favor. Finally, because no such violation has been shown, and because prison officials are necessarily entitled to some discretion and latitude, *see Hudson*, 503 U.S. at 5–6; *Whitley*, 475 U.S. at 320; *Williams*, 77 F.3d at 761, 765, the Court cannot conclude that interfering in prison discipline without a showing of either past or imminent future harm would be in the public interest. Plaintiff's prayer for injunctive relief is therefore denied.

## IV.    CONCLUSION

The Court concludes that viewing the evidence, as well as all inferences from the evidence, in the light most favorable to Plaintiff, Plaintiff has failed to demonstrate that there is a genuine issue of material fact that requires a trial on his excessive force claim. Accordingly, Defendant is entitled to judgment as a matter of law on that claim. Further, Defendant is entitled to qualified immunity on the excessive force claim; and any claim against Defendant in his official capacity is barred by the 11th Amendment. Finally, Plaintiff is not entitled to any form of requested relief, to include punitive damages or injunctive relief.

For the reasons outlined herein, the Court enters the following:

## ORDER

**IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment, (ECF No. 47), is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiff's prayer for injunctive relief, (ECF No. 2), is **DENIED**.

**IT IS FURTHER ORDERED** that this case is **DISMISSED WITH PREJUDICE.**

This the 30th day of March, 2018.


/s/ Loretta C. Biggs
United States District Judge